171636 Clipple versus DHS. 171636 Clipple versus DHS. Unlike the other cases we've heard today, this is a pretty straightforward MSPB matter regarding some emails that were sent by a GSA attorney. One of the things you have to show is nexus, that you dispute nexus. Correct, yes, Your Honor. Where in the record did Mr. Clipple raise his nexus arguments for the full MSPB? Your Honor, it was part of the entire case was whether it was off-duty conduct or it was on-duty conduct. There was a determination in the board in his final decision that they never proved whether it was on-duty conduct or off-duty conduct. Therefore, at the time, there was no full determination as to whether the other off-duty or on-duty implications came into play. If you look at the final argument of the agency, it's on APPX 1099. They talk about the catch-all phrase for finding nexus, which is that the actions negatively affected the agency's trust and confidence in the job performance. They also mention that on their response brief at page 18. Although there's no citation of any authority on that premise, in the closing argument, they state that that nexus issue is exactly what the whole centerpiece of Ms. Koerner's decision was in this case. They found nexus not based on a criminal violation, not based on the fact that it implied any kind of issue with his day-to-day operations of his job or the efficiency of service, but simply because the emails were so bad that it was a catch-all phrase and that nexus was presented. Okay, let me read to you from your brief, page 28. In its final decision, the board states point-blank that the agency failed to prove that the petitioner sent the emails while he was on duty and goes on to state, There was a nexus between the petitioner's off-duty misconduct based on the agency's internal regulations that prohibit conduct. This is not the proper standard for finding a nexus when it comes to off-duty conduct. And you cite Doe v. DOJ. Where do you argue that? Below. I was not present for the underlying argument, Your Honor. No, no, where was it argued? I'm sorry. Where did your client argue it? That specific argument? Yeah. I don't believe that it was raised below, Your Honor. That's the question I was trying to ask. The nexus argument in general, the fact that it was on-duty versus off-duty, is no different whether it was argued under that specific direction or under one that was more applicable to the scope of review for the Federal Circuit. What exactly did Mr. Klippel want Ms. Sue to testify about if the parties stipulated to his good performance record? Well, Your Honor, if you talk about whether someone is able to trust in confidence in someone's job performance, right, because that was what they say on the agency response brief at 18. They talk about that being the whole centerpiece of Ms. Kerner's decision in the case. How Ms. Kerner should be able to testify or determine what someone's direct supervisor's trust and confidence in someone's job performance is the reason why Ms. Sue should have testified, because she would be the one who would be in the best position to testify as to the trust and confidence in his job performance. Mr. Klippel doesn't allege that anyone besides himself drafted those nine emails in question, right? Correct, Your Honor. What would Rabbi Sauer testify to that Mr. Klippel hasn't already testified to? Well, it would be more important for Rabbi Sauer to determine what the motivations were behind Mr. Klippel's actions, because it wasn't as if Mr. Klippel on a Tuesday morning woke up and started sending these emails. They were a result of an emotional connection with a third party, and that emotional connection with that third party is much more easily explained by that third party. He could have also talked about perhaps there were things that were not disclosed underlying to Scott or Mr. Klippel because they were embarrassing, but being under oath, there could be a better explanation as to the threat that he felt at the time, the threat to Rabbi Sauer's children, just in general, the motivation behind Mr. Klippel's actions. And I certainly believe that in the context of the case law that I've reviewed in this matter, that a single lapse in judgment and the intent behind it is important. Well, I guess you can call it a single lapse in judgment. It's an incident, but that incident went over a period of time and included and consisted of numerous incidents of lapses of judgment, right? Well, I believe that it's more along the lines of a single occurrence that snowballed through being instigated by both sides. I agree with that, but it wasn't as if— One side, your client says, was not in his right mind. I don't think he used exactly that phrase. Yes, Your Honor, and again, all of this could be fleshed out better if we knew who the other person was. We still don't, to this day, even know who the person was, whether it was male or female, where it came from, anything about the underlying person. What difference would that make with respect to the content of your client's emails? He was charged with a TSA regulation that talks about making threats, so if you make a threat to a lamppost or you make a threat to a person, is it the TSA— You're making a threat to a person who he described as crazy, I think would be his— Well, honestly, we don't know if it's a person or not. It could be some kind of robo-generated—we have no idea because it was never ever told to us who this person was. We never were able to determine— We know it was a person, okay? It's not a lamppost. They were interviewed, were they not? They were, but we never had any ability to testify or to call them— But what difference does it make? If you have an email, the content of it is threatening. If I send an email to somebody and I say, I'm going to beat you up at lunchtime, does the other person have to appear to testify in order to determine whether the email I sent was threatening in nature or not? Well, I suppose if that person ended up getting beat up and they were charged with a crime, then whether— No, no, no. You mean threats are okay? I mean, you're right. There's different—if he sees it through, it's a different piece of conduct, but that doesn't diminish or obviate the problem with threats, right? Well, I can't just—we've all stipulated and understand that the content of the emails are embarrassing and— Threatening. Sure. But what the problem is, mainly here, is that if you look at the context of what the Federal Circuit has in the case law, that's—people have been removed, not disciplined or progressive discipline type situations, but have been removed. But your client's a lawyer. Should he be subject to different levels of discipline for being a lawyer versus another person? Yes, he's held to a higher standard. Your Honor, he's never investigated by the bar? There was never any issue at all? No, but he's subject to the rules of professional responsibility, and my familiarity with him is, amongst all the jurisdictions in the United States, a lawyer is held to a higher standard of conduct, both professionally and personally. But, Your Honor, we're not talking about an investigation by the D.C. Bar. We're talking about violating a TSA regulation that applies to all people, regardless of whether they're attorneys or not. Wait, so what are the cases that you have that we've reversed removals based on this type of conduct? Not reversed removals, but affirmed removals that were based on different conduct that was criminal. And they were the ones that were cited— Well, sure, but how does that help you? That doesn't necessarily tell you how broad the specter is. I mean, just because we've affirmed criminal stuff doesn't mean we can't affirm removals for less than criminal stuff. I fully understand that, Your Honor. That's what we're here today, to determine. Well, we do have—we've had a number of removal cases. Of course. And they pretty much go from criminal activity to a DWI to—you know, so it's not the case that you have to have criminal activity. I understand that. But the case decided by the agency simply was what I was referring to. And, of course, those cases, whether it's from a DWI to a felony charge or whatever it may be, they all look at progressive discipline. They look at the person—that's the whole purpose of the Douglas case, is to look at, per individual, whether or not they were disciplined properly. And, you know, again, we cited in the brief, too, his no past disciplinary record, his outstanding accommodations that he's had as an attorney. Simply, again, we understand that the emails themselves are difficult to get through. We get that part. But if we're talking about progressive discipline and we're talking about what you guys would affirm or deny in terms of a removal, we can't just look at the emails as they lie. We have to look, personally to Douglas, at the past. And he has no past except for a good past. And that is our differentiation. Don't refer to the court as you guys. I apologize, Your Honor. Or dudes. All right, you're into your rebuttal. Why don't you sit down and while we serve your rebuttal. Do you have much to say? Just a moment, Your Honor. Good morning. May it please the court, just quickly, I think we've very easily shown nexus here. That's sort of the key issue that the respondent or the petitioner has raised. A lot of the talk that we're hearing today and in the briefs has been a question of egregiousness. I just want to point out that the administrative judge and, as affirmed by the board, looked not only to egregiousness but also to the agency's trust and confidence in Mr. Coppell and also to the impact of his behavior on the TSA's mission of ensuring public safety. It was not merely that question of egregiousness. There were other focuses and bases. And the administrative judge found that the deciding official credibly testified as to the impact of Mr. Coppell's behavior on her trust in him and on the agency. Do you have an argument other than waiver with respect to the question of whether or not this should have proceeded through this OPR thing as opposed to through the regular channels? Your Honor, we would if it had been raised. So, as we note in our brief, had this been properly raised to the administrative judge, we would have argued and attempted to build an evidentiary record to show that, in fact, Mr. Coppell was properly disciplined through the Department of Homeland Security's and then TSA's Office of General Counsel and that that's the appropriate discipline for an attorney as opposed to the materials that Mr. Coppell has cited to which apply to non-attorneys at TSA. Now, that's not in the record and I'm not able to point to the appendix to show you that. I can't say it would have been proven for sure, but that's the argument that would have been made and it wasn't because it wasn't raised, Your Honor. Did Ms. Coppell's supervisor, did she testify before the administrative judge? She did not, Your Honor. How can you judge credibility where she says I lost confidence in him and trust in him, right? How can the administrative judge make the credibility judgment if he doesn't have that particular witness in front of him and make that judgment based on paper? Well, Your Honor, it was done on paper. However, the deciding official here did testify and the deciding official was the Chief Counsel of the Department of Homeland Security, Ms. Kerner, who was the ultimate supervisor of Mr. Coppell. She was able to testify as to her loss of confidence in Mr. Coppell's judgment and ability to perform his duties, which I'll note included a high level of public contact and a great deal of discretion in terms of mitigating fines. That's all in the record and the briefs. So the short answer is that the deciding official was in his chain of command and was able to credibly testify. And who was the proposing official? Was she someone between the supervisor and the deciding official? I believe that's correct, Your Honor. I believe that the proposing official was in the middle of that chain of command. If there are no further questions, thank you. Thank you. Got some time left. Just briefly, I believe that the proposing official was also Francine Kerner. I'm not positive about that, but I think she handled it from the get-go. And that was part of our issue with bringing up with— But Ms. Kerner did testify, correct? Yes, Your Honor. Okay. The whole point of our bringing up the TSA Management Directive, which you discussed earlier, was actually affirmed, and we have a pending motion to supplement the record as to the affirmation that the OPR should have been disciplining certain employees that were K-banned for anything over than 14 days. How does a member of the public feel when they're a minority group and they're dealing with Mr. Kleppel, and they learn that they think he's—TSA is treating them badly, and then they learn that he's made racist comments about that minority group? Your Honor, I don't believe that those emails would be subject to publication. That's part of the issue. Oh, supposing they file a complaint against him and they do discovery. It's speculation, Your Honor. I have no—I believe that— It's speculation that might well fall into the reasoning of a deciding official. But that was never discussed or even raised at all by any underlying— I think it was. It was specifically mentioned that he dealt with the public. Right. But dealing with the public is different than potentially having a racist comment come and impact him later on in a bar complaint type situation. However, if that was raised in the underlying matter, then it would have been something that could have been fleshed out in more detail, just like they said with their argument as to waiver. We weren't—that's speculation, Your Honor, respectfully. The emails were published, and once they were sent to that third person, that's publication, and they're out there in the public domain. The thing that concerned me about the case is that Mr. Klippel began sending the emails in trying to find somebody who he says was harassing him and his friends and families, and he was doing this from his home computer. So apparently he was doing everything, you know, outside of his job. But he appeared to cross the line when he invoked and said that he's going to bring the might of the government down on the head of the third person. So you're saying, Your Honor, that the line is drawn here between everything up until the implication of having a government— Yeah, is that correct? Am I correct on that? I can't for certain speak to what Ms. Kerner's line drawing or the A.J.'s line drawing was. It wasn't— But it was Mr. Klippel who invoked the government, brought the government into the fray. Simply by mentioning it in the emails? Yeah. I suppose that's correct, yes, Your Honor. He did mention it in the emails, and he did stipulate to writing them. It wasn't a simple mention, right? It was more than that. It was written in an email to an unknown individual who we still— On the basis of a threat. We conceded to what the email said, Your Honor. So I don't want to speak for my client as to what his motivations or intentions were in terms of what was stated in the emails. They are what they are, and we've never shied away from that. And that's an unfortunate consequence of my standing before you is that we— Okay. Anything else? Thank you. Thank you. We thank both sides. The case is submitted.